UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 05-470-KSF

THE CINCINNATI INSURANCE CO.                                    PLAINTIFF

V.                              **OPINION & ORDER**

CROSSMANN COMMUNITIES PARTNERSHIP
n/k/a BEAZER HOMES INVESTMENT CORP., *et al.*                   DEFENDANTS

* * * * * * * * * * * * *

This matter is before the Court on the plaintiff's motion for judgment on the pleadings [DE #55], the motion of defendant Beazer to amend answer and defenses [DE # 72], and Beazer's motion to file surreply [DE #79].[1] Also pending is the motion of third-party defendant Illinois Union Insurance Company for judgment on the pleadings [DE # 53], which will be considered separately.

I.    **FACTUAL BACKGROUND & PROCEDURAL HISTORY**

Between 1998 and 2002, Cutter Homes Ltd., a subsidiary of defendant Crossmann Communities Inc. ("Crossmann")[2] acted as general contractor for the construction of approximately 148 houses in the Beaumont subdivision in Lexington, Kentucky. Subcontractors performed all or most of the actual construction of the Beaumont houses, but Crossmann was the

---

[1]    The Court has considered all of the parties' pleadings and, therefore, this motion will be granted.

[2]    Crossmann merged into Beazer Homes Investment Corporation in April of 2002. Beazer Homes Investment Corporation later changed its name to Beazer Homes Investments LLC ("Beazer"), the named defendant in this action. Therefore, Beazer is successor-in-interest to Crossmann.

general contractor on all of the projects.

After Crossmann's merger into what ultimately became Beazer Homes Investments LLC ("Beazer"), Beaumont homeowners complained of property damage and related medical issues resulting from water intrusion into their houses, which they claim was a result of faulty workmanship by Crossmann and/or its subcontractors.[3]  Beazer notified its insurer, plaintiff The Cincinnati Insurance Company ("CIC"), investigated the claims, established a remediation protocol, and began repairing the alleged construction defects.  Beazer then submitted claims to CIC for houses with closing dates between December 1998 and July1, 2002, that have incurred damage as a result of water intrusion.

During the relevant time period, Crossmann and/or Beazer were covered by two separate policies issued by CIC:  (1)  Commercial Umbrella Liability Policy No. CCC 444 58 40 (a renewal of Policy No. CCC 438 27 66), effective July 1, 1998, to July 1, 2001 (hereinafter the "1998 Policy"); and (2)  Commercial Umbrella Liability Policy No. CCC 444 58 40 (a renewal of the 1998 Policy), effective July 1, 2001, to July 1, 2002 (hereinafter the "2001 Policy").[4]  Each policy had a $10,000,000 per occurrence and aggregate liability limit.

CIC accepted notice of the cases conditionally under a full reservation of rights.  It then filed this action on November 26, 2005, seeking declaratory judgment regarding coverage under

---

[3]     According to the reservation of rights letters, some houses developed leaks around the bricked windows, others leaked in various places due to defective installation of the brick veneer, some houses lacked an exterior vapor barrier, or joints were left unsealed.  Damage included water-impacted material, other water staining or damage to the houses, and evidence of fungal growth, microbial growth, and/or mold, which caused medical problems in some of the inhabitants.

[4]     There was also a third policy issued in 1995, but Beazer has conceded that it is not seeking coverage under that policy.

the policies at issue and also bringing a breach of contract claim for the alleged failure of Crossmann and/or Beazer to maintain underlying insurance. From a review of the record, it does not appear that any Beaumont homeowner has filed suit in connection with the defective construction. Beazer counterclaimed against CIC and filed a third-party complaint against primary insurer Illinois Union Insurance Company ("Illinois Union") for breach of contract and declaratory judgment regarding coverage.

## II.    THE PARTIES' ARGUMENTS

In the present motion, CIC asks the Court to enter judgment in its favor finding that the 1998 and 2001 Policies do not afford coverage for the water intrusion and other problems resulting from defective construction of houses in the Beaumont subdivision. It first argues that there was no coverage because, according to applicable Indiana state law, defects in construction do not constitute "accidents" and thus are not "occurrences" under the applicable policy provisions. Rather, claims for faulty workmanship arise from the homeowners' contractual relationship with the builder. Next, CIC argues that there was no "property damage" as defined by the policies and as interpreted under Indiana law. Finally, CIC argues that the 1998 Policy contained a Fungus Exclusion Endorsement, which precludes coverage even if the Court finds that the construction defect claims somehow allege an "occurrence" and/or "property damage."

Beazer responds first that CIC's arguments are barred by the doctrine of collateral estoppel based on an opinion from a South Carolina state court interpreting the same provisions of the same policies. If the Court does reach the merits, Beazer argues that it is not seeking coverage for repair and replacement of the faulty workmanship by the subcontractors, but coverage for damage to *other* components of the property caused by water intrusion that resulted

from the allegedly faulty workmanship (i.e., work done by other subcontractors).  Beazer also admits that it is not seeking coverage under any policy other than the 1998 and 2001 Policies and rejects CIC's argument that the 1998 Policy contained a fungus endorsement.

In reply, CIC argues that collateral estoppel is not applicable to the present case, as it has been waived and, further, does not apply.  It then reiterates its earlier argument that there is no coverage under the CIC policies for defective construction or for the alleged damage caused by defective construction.  CIC also counters that the fungus exclusion was, in fact, part of the 1998 Policy, as well as the 2001 Policy and, therefore, any claims involving mold or fungus are excluded from coverage.

## III.   ANALYSIS

### A.   <u>Standards</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  <u>Patton v. Bearden</u>, 8 F.3d 343, 346 (6th Cir. 1993) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986)).  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

-4-

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. Id. at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

**B.    Choice of Law**

The parties agree that Indiana law applies to their dispute involving the insurance policies.[5] Therefore, the Court will apply Indiana law in interpreting the insurance contracts at issue. However, in order to resolve Beazer's argument that CIC's claims are barred by collateral estoppel, also known as issue preclusion, this Court must apply the law of the state that rendered the opinion, which in this case is South Carolina. Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 81 (1984); Hapgood v. City of Warren, 127 F.3d 490, 493 (6th Cir. 1997).

**C.    Collateral Estoppel/Issue Preclusion**

Pursuant to South Carolina law, "[c]ollateral estoppel prevents a party from relitigating in

---

[5]    By "parties," the Court refers to the parties involved in this motion:  CIC and Beazer.  Third-party defendant Illinois Union, which has filed a separate motion for judgment on the pleadings, contends that Kentucky law should be applied and does not agree that Indiana law applies.  The Court will analyze that question separately when considering Illinois Union's motion, but applies Indiana law to the present motion.

a subsequent suit an issue actually and necessarily litigated and determined in a prior action."
Plott v. Justin Enter., 649 S.E.2d 92, 96 (S.C. Ct. App. 2007) (quotations and citation omitted).
"[O]nce final judgment on the merits has been reached in a prior claim, the relitigation of those
issues actually and necessarily litigated and determined in the first suit are precluded as to the
parties and their privies in any subsequent action based on a different claim."  Carrigg v. Cannon,
552 S.E.2d 767, 770 (S.C. Ct. App. 2001) (quotations and citation omitted).  Beazer asserts that
an opinion from the Horry County, South Carolina, Court of Common Pleas (the "South Carolina
State Action") bars CIC from relitigating the issues raised in this Court.

The facts of the South Carolina State Action are similar to the facts presented here.  In
that declaratory judgment action, Crossmann and/or Beazer was the architect, general contractor,
and developer of a number of condominium developments in South Carolina.  All of the work at
all of the projects was performed entirely by subcontractors.  The faulty workmanship of certain
subcontractors (i.e., the window and siding installers) resulted in property damage from water
intrusion to the work of other subcontractors whose work was not faulty (i.e., the work of the
framing subcontractors) in the approximate amount of $7.2 million.  When CIC and others
refused coverage under the 1998 Policy, Crossmann/Beazer filed a declaratory judgment action
in South Carolina state court regarding the insurers' duty to defend and indemnify.  The CIC
policy at issue is the same 1998 Policy presently before this Court.

The parties agreed that the law of South Carolina applied.  In its findings, the South
Carolina court found that because the property damage complained of did not begin until after
the buildings were completed, "there was damage only to the property of the others, i.e., the
property owned by the homeowner-plaintiffs[,]" as opposed to there being damage to the

contractor's own property or work.  Based on the above facts and the court's additional findings, the South Carolina state court held that the damages complained of were caused by "occurrences" under the applicable policies and, thus, there was coverage.  The court noted, without further explanation, that the terms "occurrence," "accident," and "repeated exposure to the same general harmful conditions" were susceptible to more than one reasonable meaning, and since they were ambiguous, were required to be construed strictly in favor of coverage.  The court also noted that a claim of faulty workmanship that caused and resulted in property damage to "components" of a building that were not previously damaged is an occurrence, citing L-J, Inc. v. Bituminous Fire & Marine Ins. Co., 621 S.E.2d 33, 36 n.4 (S.C. 2005).

The Court finds that collateral estoppel does not bar CIC's claims in the present case. The substantive law of South Carolina, not Indiana, applied in the South Carolina State Action. While Beazer contends that the substantive law of Indiana and South Carolina are "materially identical regarding the interpretation of 'occurrence' in CGL policies," they only provide limited examples and, based upon the Court's own research, the Court is not prepared to say that this is the case.

For example, in the South Carolina State Action the court found that the term "accident" was ambiguous.  However, Indiana courts are very clear that faulty workmanship can never be considered an "accident" as that term is used in commercial general liability policies.  See, e.g., Amerisure, Inc. v. Wurster Const. Co., Inc., 818 N.E.2d 998, 1004 (Ind. Ct. App. 2004); Jim Barna Log Sys. Midwest, Inc. v. General Cas. Ins. Co. of Wis., 791 N.E.2d 816, 824 (Ind. Ct. App. 2003); R.N. Thompson & Assocs., Inc. v. Monroe Guar. Ins. Co., 686 N.E.2d 160, 165 (Ind. Ct. App. 1997).  As far as Indiana law is concerned, there apparently is no ambiguity as to

the meaning of the word "accident" in a CGL policy when the alleged "accident" is faulty workmanship.  Further, based upon the South Carolina state court's conclusions, it appears that Indiana and South Carolina law differ in their determination of the scope of a general contractor's "work" or "work product."  Indiana law also differs in that a transfer of title from a contractor to a homeowner does not affect the scope of a CGL policy's coverage.  The South Carolina court found that there was property only to the damage of "others," not to property of the general contractor because the damage occurred to the houses after they were completed. Under Indiana law, the house is still considered the workmanship of the contractor, regardless of who holds the title.[6]  Based on the above, the Court cannot say that the issue sought to be precluded in this case is the same issue that was involved in the South Carolina State Action.

Beazer is correct that the Full Faith and Credit Act, 28 U.S.C. § 1738, requires this Court to give preclusive effect to the South Carolina state court's findings and judgment to the same extent that other courts in South Carolina would do so.  Thus, pursuant to the Act, if CIC were to bring an action in this Court involving the interpretation of the 1998 Policy *under South Carolina law*, then this Court would be obliged to give preclusive effect to the South Carolina State Action opinion.  However, under the present circumstances, neither the Full Faith and Credit Act nor the doctrine of issue preclusion come into play.[7]

---

[6]     These examples are discussed more fully in the sections below.

[7]     CIC also argues that Beazer waived the affirmative defense of collateral estoppel by failing to include it in its answer.  However, Beazer has since moved to amend its answer to include collateral estoppel as a defense, so the Court will grant the motion and consider the defense.

D.     **Property Damage**

The 1998 and 2001 Policies state that CIC

will pay on behalf of the insured the "ultimate net loss" which the insured is
legally obligated to pay as damages in excess of the "underlying insurance" or for
an "occurrence" covered by this policy which is neither excluded or not covered
by "underlying insurance" because of:

1.     "Bodily injury" or "property damage" covered by this policy occurring
       during the policy period and caused by an "occurrence" . . . .

(Third Am. Compl. Exh. B at p. 6.)  Therefore, in order to have coverage, there must be both

"property damage" and an "occurrence."  "Property damage" is defined as "[p]hysical injury to or

destruction of tangible property including all resulting loss of use."

        Indiana courts have addressed a number of cases involving CGL policies as they relate to

faulty workmanship of a contractor and/or subcontractor.[8]  In R.N. Thompson & Assocs. v.

Monroe Guaranty Ins. Co., 686 N.E.2d 160 (Ind. Ct. App. 1997), the case most heavily relied on

by the parties in this case, a homeowners association sued its builder/developer for damages

necessary to repair or replace a defectively designed roof decking on several housing units.  The

builder/developer, in turn, looked to its CGL insurer for coverage under the policy.  The trial

court granted summary judgment in favor of the insurer, concluding that the homeowners

association was only claiming "economic loss" which was not considered "property damage"

under the policy, and that the damages were not covered because they did not arise from an

"accident."

---

        [8]       The contractor/subcontractor distinction is an important one to bear in mind when
analyzing these cases and cases from other jurisdictions.  Courts are not always precise in the
language they use, causing confusion in the resulting case law.  But this distinction is one that
distinguishes a number of the cases cited by the parties.

-9-

The Indiana Court of Appeals discussed in detail the scope of CGL coverage in such cases.

> The great weight of that authority is to the effect that CGL policies cover the possibility that the **goods, products, or work of the insured, once relinquished or completed**, will cause bodily injury or damage to property *other than* to the product or completed work itself, and for which injury or damage the insured might be exposed to liability.  The coverage is for tort liability for physical damages to others, and not for contractual liability of the insured for economic loss suffered because the completed work is not what the damaged person bargained for.  *See, e.g., Weedo* [*v. Stone-E-Brick, Inc.*]*,* 405 A.2d at 791 [(N.J. 1979)]; *Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co.*, 323 N.W.2d 58, 63 (Minn. 1982); *Vernon Williams and Son Constr., Inc., v. Continental Ins. Co.*, 591 S.W.2d 760, 763 (Tenn. 1979).

Id. at 162 (first emphasis supplied).  The Indiana court further outlined the two separate types of risk that arise from any contractor's work:  business risk and risk to others.  Business risk is borne by the contractor-insured, while the risk that the contractor-insured's work will injure another's property or person is a risk covered by the policy.

> This interpretation of the extent of CGL coverage is premised on the idea that an insured contractor's work gives rise to two different types of risk. . . . When the contractor's work is faulty, either express or implied warranties are breached, and a dissatisfied customer may recover the cost of repair or replacement of the faulty work from the contractor as the standard measure of damages for breach of warranty.  *Weedo*, 405 A.2d at 791.  This consequence of not performing well is part of every business venture, and the repair or replacement of faulty goods and work is a business expense, to be borne by the contractor in order to satisfy customers.  *Id.*
> But there is also a second kind of risk inherent in a contractor's line of work; that is, injury to people and damage to property caused by faulty workmanship.  This type of accidental injury to persons or property can expose the contractor to almost limitless liability.  *Id.*  And while the same neglectful craftsmanship can result in both a business expense of repair or replacement and a loss represented by damage to persons or property, *id.; Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1279 (Ind. 1980), the two results are vastly different in relation to sharing the costs of such risks as a matter of insurance underwriting.

Id. at 162.

-10-

The court in <u>R.N. Thompson</u> relied on language in the <u>DeZutti</u> case, cited in the excerpt above, which held that "the CGL policy at issue did not provide coverage to include reimbursement to a builder for expenditures required to correct, repair, or replace his own poor workmanship." <u>Id.</u> at 163 (citing <u>DeZutti</u>, 408 N.E.2d at 1279). The court ultimately concluded that since the claim did not arise from damage to property other than the contractor-insured's completed work itself, there was no "property damage" covered by the CGL policy.

Other Indiana cases have held similarly. In <u>Jim Barna Log Sys. Midwest, Inc. v. General Casualty Ins. Co. of Wisc.</u>, 791 N.E.2d 816 (Ind. Ct. App. 2003), the plaintiff ("Barna"), a seller of log homes, and its agent sued the seller-insured's CGL insurer for a declaratory judgment that the insurer owed a duty to defend and indemnify them in a suit brought by the buyers. The buyers had sued Barna for negligence, breach of contract, conversion, fraud, and misrepresentation after they encountered problems with their log home. Barna and its agent had sold the log home package to the buyers and arranged for a contractor to build it. The insurer argued that the complaint failed to allege either an occurrence or property damage under the policy.

Citing <u>R.N. Thompson</u>, the court noted the two types of risks inherent in a contractor's business – business risk versus occurrences that give rise to insurable liability. Based on <u>R.N. Thompson</u> and <u>DeZutti</u>, the court noted that it was "guided by the overall principle that, here, the CGL Policy 'does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident.' " <u>Jim Barna Log Sys.</u>, 791 N.E.2d at 824 (quoting <u>Weedo</u>, 405 A.2d at 796). In other words, the "guiding principle" a court should consider is that a CGL policy does not cover business risks, but only insurable risks – faulty workmanship of the insured which

-11-

causes an accident, not the faulty workmanship itself.  The court ultimately held there was no "occurrence" and did not reach the question of whether there was "property damage" under the policy.  (This case is discussed in more detail below.)

In Amerisure, Inc. v. Wurster Const. Co., 818 N.E.2d 998 (Ind. Ct. App. 2004), Wurster, the general contractor-insured, brought a declaratory judgment action against its CGL insurer arguing that the policy provided coverage for faulty construction projects.  Wurster had hired subcontractors to install exterior sheathing and exterior insulation finish systems, which turned out to be faulty.  After the projects were completed, the buyers called on Wurster to repair and replace the faulty systems.  The damage to the projects did not extend beyond the faulty systems themselves.

The general contractor-insured argued that because the systems had failed, the buildings themselves had been "damaged" and this constituted damage to *other* property as contemplated by the definition of the term "property damage."  The court held that because there were no allegations that any person or property other than the faulty systems was damaged due to the defects, the damage due to the faulty workmanship did not involve "property damage."

In a more recent case decided by the United States District Court for the Southern District of Indiana, Selective Ins. Co. of the Southeast v. Cagnoni Development, LLC, No. 1:06-cv-0760-CFH-TAB, 2008 WL 125950 (S.D. Ind. Jan. 10, 2008), a contractor-insured designed and installed a roof on a commercial warehouse.  Subsequently, the roof leaked into the warehouse, causing damage to one tenant's products and rendering an entire floor of the warehouse unusable.  The owners filed suit against the contractor-insured for damages related not just to repairing the roof, but also for damages to the remainder of the warehouse and the tenant's goods.  The

-12-

contractor's CGL insurer filed a declaratory judgment action to determine coverage.

Citing R.N. Thompson, Amerisure, Weedo, DeZutti, and other cases, the court held that the damage to the roof itself did not constitute either property damage or an occurrence and, therefore, the CGL insurer was not responsible for covering the costs of any associated repairs. As to the damage to the property in the warehouse and the clean-up costs, those *were* covered by the policy as unexpected damage to *other* property that was caused by the faulty workmanship.

All of these cases lead to the fairly straightforward proposition that damage consisting of the faulty workmanship of the insured is not covered as "property damage," but damage caused by the faulty workmanship of the insured to *others'* property is covered. And while the principles of these cases must guide the present case, none is directly on point. In R.N. Thompson, the damages claimed did not extend beyond the faulty workmanship of the contractor-insured. In that case, the court held that it did not matter whether the losses resulted from the contractor's own work or that of a subcontractor. R.N. Thompson, 686 N.E.2d at 163 n.5 (noting that because there was no injury to any property apart from the roof decking itself and thus no "property damage," the court did not need to address whether the work was actually performed by the contractor-insured or one of its subcontractors). Further, it involved a contractor doing limited work on an existing structure, not a general contractor responsible for building an entire house. The Jim Barna Log Systems Midwest case did not necessarily involve a general contractor/ subcontractor situation, but one where the faulty workmanship was conducted by someone recommended by the insured. It also turned on whether there was an "occurrence." In Amerisure, as in R.N. Thompson, the damages claimed did not extend beyond the faulty workmanship, although the work itself was done by a subcontractor of the general contractor-

-13-

insured. The <u>Cagnoni Development</u> case is closer to the facts of the <u>R.N. Thompson</u> case in that the contractor-insured actually did the work and the work itself was limited and performed on an existing building – it apparently did not present a situation involving general contractors and subcontractors.

The facts of this case are slightly different and it is essential to keep this in mind, particularly given Beazer's argument.  In this case, Crossmann, as the general contractor-insured, contracted with homeowners to build their houses.  Thus, Crossmann was responsible for construction of the entire house, even if it did not perform any of the actual work.  This begs the question of what exactly is a general contractor's "work" or "workmanship."  This is where Beazer's argument breaks down because it ignores the fact that, under Indiana law, the *entire house* was the work of Crossmann as the general contractor-insured.  Beazer's argument also ignores the fact that the coverage question must be analyzed from the viewpoint of the insured, which in this case is a general contractor, and not the individual subcontractors.

Beazer relies on the business risk/occurrence distinction in Indiana law in arguing that faulty work done by a subcontractor to one "component" of the houses (a business risk it concedes is not covered by the CGL policy) resulted in damage to other "components" of the houses that were not faultily constructed (an occurrence they argue is covered by the CGL policy).  Beazer's argument fails because it ignores the fact that when analyzed from the point of view of the insured, the workmanship of the general contractor-insured is the *entire house* itself, not just particular "components" of the house constructed by one or another of its subcontractors.

Indiana law – and the law of other states – supports this conclusion.  The <u>DeZutti</u> case involved a general contractor-insured who built a house using subcontractors to perform some, if

-14-

not all, of the work.  Seven years after the general contractor sold the house, the homeowners

discovered serious cracks in the mortar and bricks caused by settling of the home due to improper

construction of the footings.  The footings work was done by a subcontractor, not the general

contractor-insured, and resulted in damage both to the footings and the house in general.  Noting

the dual-risks faced by contractors and discussed above, the Indiana Supreme Court held that the

general contractor-insured's CGL policy did not cover the damages:

> The same neglectful craftsmanship may cause both a business expense of
> repair and a loss represented by damages to persons and property other than the
> insured's own product or work.  If, ***as in this case***, the damage is confined to the
> insured's own product or work, it is a business risk and expense not intended to be
> covered under the policy . . . .

DeZutti, 408 N.E.2d at 1279 (emphasis included).  This language suggests that damage to any

part of the house, regardless of whether it was a result of a subcontractor's work and regardless

of whether it required repair of both a faulty "component" of the house (the footings) and a

"component" that was not faultily construed (the bricks and mortar), is not covered because *the*

*entire house* is the general contractor's workmanship so far as the CGL policy is concerned.  The

DeZutti court stated this expressly later in the case:

> The issue as applied to the facts of this case is whether exclusion (o)
> applies to the damage to the entire house as being Gilson's [the general
> contractor-insured] "work" or only applies to the footing which was the
> component part out of which the loss arose.  The answer depends upon the
> meaning of the insured's "work" which obviously is determined by who the
> insured is.
>     ***Gilson is a general contractor and his product or work must be the***
> ***entire project or house which he built and sold.***  The exclusion for damages to
> his work arising from the product or work itself will necessarily be broader than a
> subcontractor's exclusion.  A subcontractor's product or work is merely a
> component part of a larger work or product. . . .
>     The trial court may have erroneously relied upon cases cited by Gilson
> involving subcontractors rather than general contractors, a factor which would

-15-

alter the meaning of "product" or "work" in relation to those parties. ***Because Gilson was the general contractor over the construction of the entire residence, his finished product or work was the entire house, including the footings*** [which were constructed by a subcontractor]. The footing was a component part of Gilson's product or work done on his behalf and the policy clearly states that damages to the product or work arising from a part of the product or work are excluded from coverage.

Id. at 1281 (emphases supplied). Other courts have held similarly. See also Schwindt v. Underwriters at Lloyd's of London, 914 P.2d 119, 125 (Wash. Ct. App. 1996) (holding that where alleged damage resulted from either defective products or faulty work, the exclusions applied, even to damage done to other non-faulty components of the building "because this damage is still part of the defective building itself . . . ."); Vari Builders, Inc. v. U.S. Fidelity & Guar. Co., 523 A.2d 549, 552 (Del. Super. Ct. 1986) (holding that "damage to any part of the house itself is damage to the work of the insured [general contractor] which is excluded from coverage by the modified exclusion (o) contained in the endorsement"). Thus, although DeZutti examined an exclusion rather than insuring clause, it provides clear direction as to how an Indiana court would analyze the present case. Indiana courts have also recognized that while the DeZutti case focused on exclusions, not the definition of "property damage" in the insuring clause, DeZutti's reasoning has led courts to the same result without reliance on the policy exclusions. See R.N. Thompson, 686 N.E.2d at 163 n.4.

This is where Beazer's argument falls apart, because it requires the Court to look at the "faulty/non-defective work" distinction from the perspective of the subcontractors rather than the general contractor-insured. The general contractor's work product was the entire house; the *subcontractors'* work product were the "component parts" that they constructed or furnished.

-16-

Beazer's argument gets it backwards.[9]

In the present case, the damage extended beyond the faulty workmanship of Subcontractor A and damaged Subcontractor B's non-defective work, but since both subcontractors' work is attributed to the general contractor, any damage that did not extend beyond the faulty workmanship *of the general contractor-insured* is not considered "property damage" under Indiana law.  Beazer attempts to artificially parse the parts of the house into separate "component" work products, which might make sense when viewing the issue from the viewpoint of a subcontractor-insured, but that is not the case presented here.  This distinction between the work of the subcontractors makes no difference when viewing, as you must, the house from the perspective of the general contractor-insured, who contracted with the homeowner to build an entire house.

In the present case, Beazer seeks coverage for damages caused by water intrusion that resulted from the allegedly faulty workmanship of one or more of Crossmann's subcontractors, including investigative costs, costs associated with repair of property "other than the components that were themselves defectively constructed," and "other parts of the affected homes, such as exterior sheathing, OSB, studs, and sheetrock."  Any costs associated with the repair of any "component" of the houses built by Crossmann, whether existing of faulty construction or non-defective work, are not "property damage" under the CGL policy and Indiana law.  If there are true third-party claims,[10] such as claims that property *other than the house* was damaged by the

---

[9]      This is also an issue upon which South Carolina apparently differs, based upon the court's opinion in the South Carolina State Action.

[10]      The fact that the damage was reported to Beazer after the houses had been
(continued...)

-17-

water intrusion (e.g., homeowner's personal property or personal injury to the homeowners themselves), those claims would be covered to the extent they are not otherwise excluded by the policies at issue.

### E.    Occurrence

Even if the damage at issue in this case was "property damage," there is no coverage unless the damage is also an "occurrence." An "occurrence" is defined in the policies as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in 'bodily injury' or 'property damage.' " (Id. at p. 17.) The term "accident" is not further defined in the policies at issue, but several of the Indiana cases cited above shed light on this question, as well.

The court in R.N. Thompson addressed whether the damage at issue there constituted an occurrence. It noted that "[a]n 'accident,' in the context of insurance coverage, is 'an unexpected happening without an intention or design.' " R.N. Thompson, 686 N.E.2d at 164 (citation omitted). Noting that the construction of "occurrence" and "accident" in the context of a CGL policy was a matter of first impression in Indiana, the court looked to other authorities, citing a Michigan case that held there was "no reasonable basis in the policy language for [the insured] to expect coverage for defective workmanship." Id. at 165 (citation omitted). The court cited an

---

[10](...continued)
transferred to the homeowners makes no difference in the analysis of the scope of CGL policy coverage. R.N. Thompson, 686 N.E.2d at 162 ("CGL policies cover the possibility that the . . . work of the insured, *once relinquished or completed,* will cause bodily injury or damage to property *other than* to the product or completed work itself . . . .") (first emphasis supplied). A change in title alone does not transform the general contractor's work product into a third person's property for purpose of this analysis, as suggested by the opinion issued in the South Carolina State Action, at least under Indiana law.

Illinois case for the proposition that "the natural and ordinary consequences of an act are not an 'accident,' " noting that damage to other non-defective work was a natural and ordinary consequence of the installation of the underlying defective work.  Id.  The R.N. Thompson court ultimately held that the degradation of the plywood used as roof decking was also the natural and ordinary consequence of the faulty work done by the contractor or under its supervision and, therefore, not an "accident" but a breach of contract arising from faulty workmanship and defective materials.  Thus, any related damages were not covered by the CGL policies because there was no "occurrence."

In Wurster, the builder argued that the failure of the systems at issue was an unexpected happening and, therefore, an "accident" that should be covered.  The court rejected this argument, noting that "[t]he failure of these interconnected systems [was] the natural and ordinary consequence of the defective work done by [the contractor] or under its supervision. Yet, '[t]he natural and ordinary consequences of an act do not constitute an accident.' "  Wurster, 818 N.E.2d at 1004-05.

Despite arguments that the faulty workmanship was negligent or non-intentional conduct in which resultant damage would not be expected or intended by the insured, the court in Jim Barna Log Systems Midwest noted that "an allegation of negligence is not necessarily an allegation of accidental conduct as defined in the context of a [CGL] insurance policy."  Jim Barna Log Sys. Midwest, 791 N.E.2d at 825.  The court noted that the analysis focuses on the "accidental nature of the conduct," not the accidental nature of the *results* of the conduct.  Id. Thus, even if in that case the seller of the log home had acted negligently or carelessly by hiring the builder, "the act itself was intentional, not accidental."  Id. at 826.  In other words, because

-19-

the seller had intended to hire the builder, this act could not be considered accidental under the CGL policy.

Focusing on the nature of Crossmann's conduct in the present case and following the logic of the cases cited above, even if Crossmann and/or its subcontractors were negligent in building the houses and did not intend a defective result, the act itself of building the houses was intentional and cannot be considered accidental conduct under the policies.  Further, any damage to the non-defective components of the houses was also the natural and ordinary consequence of the faulty work done by Crossmann or by subcontractors under its supervision and, therefore, not an "accident."  Therefore, these damages cannot be considered an accident under Indiana law and, thus, not an "occurrence" under the policies at issue.[11]

### F.    **Fungus Endorsement**

Finally, CIC argues that a fungus exclusion endorsement in the policies also precludes coverage.  Indiana law is clear that

> if the insuring clause does not extend coverage, one need look no further.  If coverage exists, exclusions must then be considered.  If an exclusion excludes coverage, an exception to the exclusion may re-grant coverage.  However, the entire process must begin with an initial grant of coverage via the insuring clause; otherwise, no further consideration is necessary.

Wurster, 818 N.E.2d at 1005.  As in Wurster, the Court need not address any arguments regarding exclusions with respect to claimed property damage "because here there is no initial coverage due to the lack of 'property damage' and an 'occurrence.' "  Id.

---

[11]    Beazer's argument regarding "occurrence" suffers largely from the same defect as its argument regarding "property damage" in that it focuses on the "defective workmanship" of the subcontractors without considering that the "workmanship" or "work product" of the general contractor is the entire house.

However, as to any claims that the homeowners suffered bodily injury due to fungus or mold[12] caused by the defective construction and/or water intrusion, the Court is of the opinion that the Fungus Exclusion excludes coverage for these claims. Despite Beazer's argument that the 1998 Policy did not contain the Fungus Exclusion, a review of the "Forms List" in the 1998 Policy reveals that Form IA450A dated 11/87 (the Fungus Exclusion) was, in fact, included in the policy.[13] The exclusion is very broad in excluding any liability "arising out of, resulting from, caused by, contributed to, or in any way related to any 'fungus[,]' " or the abatement thereof.

## IV.    CONCLUSION

Based upon the Court's consideration of and finding that the opinion in the South Carolina State Action does not preclude the claims raised herein, the Court will grant Beazer's motion to amend its counterclaim to include an affirmative defense of res judicata, but finds that the defense is inapplicable to the present case.

Accordingly, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that

   (1)    the claims submitted to CIC by Beazer for coverage under the 1998 and 2001 Policies for water intrusion and other problems resulting from defective construction do not constitute either "property damage" or an "occurrence" under the policies as construed under Indiana law;

---

[12]    The exclusion defines "fungus" to include any form or type of mold, mildew, mycotoxins, spores, allergens, scents or other byproducts produced or released by fungus.

[13]    A copy of the form apparently was filed in the record with the copy of the 2001 Policy, but not the 1998 Policy, leading to some confusion.

-21-

(2)     to the extent Beazer has submitted claims to CIC for coverage under the 1998 and 2001 Policies for bodily injury resulting from fungus, those are excluded under the Fungus Exclusion;

(3)     the plaintiff's motion for judgment on the pleadings [DE #55] is GRANTED;

(4)     the motion of defendant Beazer to amend answer and defenses [DE # 72] is GRANTED and same shall be filed in the record, but the Court also finds that the defense of res judicata is inapplicable to this case;

(5)     Beazer's motion to file surreply [DE #79] is GRANTED and same shall be filed in the record; and

(6)     this order is interlocutory in all respects.

This March 20, 2008.

**Signed By:**

***Karl S. Forester***   *K S F*

**United States Senior Judge**

-22-